## SNYDER v. COMMISSIONER OF INTERNAL REVENUE.

### No. 9870.

Circuit Court of Appeals, Sixth Circuit.

April 2, 1945.

Earl Waring Dunn, of Grand Rapids, Mich., for petitioner.

Muriel Paul, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, A. F. Prescott, and Miriam Lashley, all of Washington, D. C., on the brief), for respondent.

Before SIMONS, MARTIN, and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

Homer Snyder, a Michigan farmer, has petitioned for the review of a decision of the United States Tax Court, holding him liable for a deficiency in unjust enrichment tax for 1935 of $6,763.59, plus a 25 percent penalty for delinquency amounting to $1,690.90, and a 5 percent penalty for negligence in the amount of $338.18.

The deficiency was found to rest upon two joint ventures by the taxpayer: one with Clarence Oatman for a period from July to October, inclusive, 1935, resulting in unjust enrichment in the amount of $4,951.70, and the other with Clarence and Myron Oatman for a period covering June through October of the same year, with resultant unjust enrichment in the amount of $3,502.79. The total of these two items, amounting to $8,454.49, was reduced by 20 percent pursuant to Section 501(a) (1) of the pertinent statute, 26 U.S.C.A.Int.Rev.Acts, page 944. See Revenue Act of 1936, c. 690, 49 Stat. 1648, 26 U.S.C.A.Int.Rev.Code, page 813 et seq.

The Commissioner of Internal Revenue had found that the petitioner became unjustly enriched in the sum of $16,084.90. This amount was reduced by the Tax Court to $8,454.49 by eliminating as un-

sustained an alleged joint venture of the petitioner with Myron and Clarence Oatman from January through April, 1935, and an alleged joint venture with Peter Salm from November through December of that year.

It appears that, in January, 1935, petitioner had granted to a neighboring farmer, Myron Oatman, and his brother, Clarence, the use of his slaughter house for the slaughtering of their hogs, upon condition that they would keep it clean and haul the inedible offal out to the petitioner's fields. During the months of January, February, March and April, 1935, Myron and Clarence Oatman slaughtered their hogs upon the agreed conditions. The Tax Court found that petitioner was not a joint venturer with them during that time.

Early in June, Clarence Oatman moved into a house on petitioner's farm, where he resided until the latter part of October. During this period he and his brother continued to slaughter hogs at the petitioner's farm-slaughter house.

On the night of June 3rd, Snyder and Clarence Oatman drove to Chicago, where, on the following day, they purchased 60 hogs for $1,040 and 30 sheep for $395. The Tax Court found that the petitioner purchased the hogs "either for himself or in conjunction with Clarence," who paid no part of the purchase price. It was found further that on June 3rd petitioner had borrowed $1,000 from a bank; had deposited $1,035 in cash and $169.36 in checks to his checking account; and had drawn on this account the check given in payment for the hogs and sheep, which were delivered in the same truckload on the morning of June 5th to his slaughter house. The animals were slaughtered there and, during June, their carcasses were sold to wholesalers in Grand Rapids.

Significantly, numerous deposits of cash and of checks were made to his bank account by the petitioner, Snyder, during the month of June.

The purchase on June 4, 1935, of the hogs in Chicago, and their subsequent slaughter and sale, was deemed by the Tax Court to have been the initial basis for the imposition of the tax here involved.

The following salient circumstances led the Tax Court to infer that the joint venture of petitioner and the Oatman brothers continued from its inception until dissolved with Myron in the latter part of September and with Clarence on October 24, 1935, the date on which a distraint warrant was levied by the Collector against petitioner's bank account.

From the latter part of August until October 24th, petitioner purchased more than 500 hogs for slaughter on his farm. He paid for these hogs with checks drawn on his own account. During this period Clarence Oatman also purchased hogs to be slaughtered at Snyder's slaughter house, and Myron, too, slaughtered hogs there until the latter part of September.

During the months of June, July, August, September and October of 1935, the dressed hogs from the Snyder slaughter house were sold to various concerns in the vicinity of Grand Rapids.

The Tax Court found that most of these sales were made to Thomasma Brothers, wholesale packers, whose invoices for the period from July 15th to October 22nd, 1935, showed that a total of 108,087 pounds of dressed pork was delivered to them from petitioner's slaughter house at an aggregate price of $16,765.46. During September and October, petitioner deposited $16,027.40 to his bank account. Using a conversion factor of 132, the hogs delivered represented 142,674.84 pounds live weight. Prices varied from 14 to 16¾ cents per pound for dressed hogs and from 13 to 15 cents per pound for sows. Some of the invoices bore a notation to the effect that the processing tax had been paid by the slaughterer. Yellow copies of the invoices were turned over by the Oatmans to the petitioner. All of the October invoices were issued in the name of Clarence Oatman.

In addition to the amounts paid by them as shown by the invoices, Thomasma Brothers issued four checks payable to either M. Oatman or C. Oatman in the total amount of $1,606.16, representing 10,038.56 pounds of dressed pork, or 13,250.89 pounds live weight. One of these checks was endorsed by C. Oatman, and by the petitioner, and deposited to the latter's bank account. Petitioner also deposited in cash with his bank sums approximately equal to the total sum represented by two of the other three checks issued by the Thomasma Brothers to the Oatmans.

The checks drawn by Thomasma Brothers in payment for the dressed hogs covered by the foregoing invoices were made payable to the Oatmans, none of whom had a bank account. These checks were usually deposited to petitioner's bank ac-

count or were cashed by him. One check, dated October 21, 1935, for $152, drawn by a Grand Rapids butcher, Falarsky, covering the purchase of 950 pounds of dressed hogs at 16 cents per pound, was made payable to Homer Snyder, although Clarence Oatman had made delivery of the pork. Deliveries of the dressed hogs during the period from June through September, 1935, to the Grand Rapids market were made either by Clarence or Myron Oatman, or by their brother Arthur, who worked for Myron; but petitioner made deliveries in his own truck during October, 1935.

■ Denying any joint venture with the Oatmans, petitioner failed to carry the burden of showing that the unjust enrichment assessment made against him by the Commissioner was erroneous. The Tax Court, having found that there was a continuing joint venture, accepted the Commissioner's calculations and determination of the tax for a period from the inception of the joint venture in June, 1935, through October 24, 1935. This course was correct; though in the state of the record, the factual basis of the Commissioner's determination is not revealed as satisfactorily as could be desired.

■■ We have been told that when a Court of Appeals, in reviewing a decision of the Tax Court, cannot separate the elements of a decision, so as to identify a clear-cut mistake of law, the decision of the Tax Court must stand, and that the finality of administrative determination in other fields is applicable to determinations of the Tax Court, whose decisions must have "warrant in the record and a reasonable basis in the law," but that the judicial function is exhausted when there is found to be a rational basis for the conclusions of the Tax Court. See Dobson v. Commissioner of Internal Revenue, 320 U.S. 489, 501, 502, 64 S.Ct. 239, 88 L.Ed. 248.

■ We have been cautioned, also, that except where a question of law is unmistakably involved, a decision of the Board of Tax Appeals (now the Tax Court), "having taken into account the presumption supporting the Commissioner's ruling, should not be reversed by the federal appellate courts," and that "careful adherence to this principle will result in a more orderly and uniform system of tax deductions in a field necessarily beset by in-numerable complexities." Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 475, 64 S.Ct. 249, 254, 88 L.Ed. 171.

■ And again, the Supreme Court quite recently declared that the Tax Court has the primary function of finding the facts in tax disputes, weighing the evidence, and choosing from among conflicting factual inferences and conclusions those which it considers most reasonable; that the Circuit Courts of Appeal have no power to change or add to those findings of fact or to reweigh the evidence, the factual pattern being "too decisive and too varied from case to case to warrant a great expenditure of appellate court energy on unravelling conflicting factual inferences." Commissioner of Internal Revenue v. The Scottish American Investment Company, Limited, 323 U.S. 119, 123, 124, 125, 65 S.Ct. 169, 172. The opinion dictated: "The judicial eye must not in the first instance rove about searching for evidence to support other conflicting inferences and conclusions which the judges or the litigants may consider more reasonable or desirable. It must be cast directly and primarily upon the evidence in support of those made by the Tax Court." It was added that the skilled judgment of the Tax Court, which is "the basic fact-finding and inference-making body," should be given wide range.

In Commissioner of Internal Revenue v. Wemyss, 65 S.Ct. 652, 653, the highest tribunal reversed this court in a gift tax case, in which we had thought that, the facts being undisputed, we were presented with a clear-cut question of law; and so held in construing the statutes that a donative intent followed by a donative act is essential to constitute a gift. The Supreme Court pointed to "the major rôle which the Tax Court plays in federal tax litigation," and declared that the Tax Court's conclusion on the issue was "no less to be respected than were the issues which we deemed it was entitled to decide as it did in Dobson v. Commissioner of Internal Revenue 320 U.S. 489, 64 S.Ct. 239 [88 L.Ed. 248]; Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 64 S.Ct. 249 [88 L.Ed. 171]; Commissioner of Internal Revenue v. Scottish American Co., 323 U.S. 119, 65 S.Ct. 169."

The instant case presents only issues of fact, which have been resolved by the Tax Court upon rationalization, based in part upon substantial direct evidence and

in part upon inferences drawn from rather hazy circumstantial evidence. We find no clear-cut mistake of law in the reasoning of the Tax Court; and, though our individual reasoning might lead to different inferences, we are constrained by the binding authorities which have been cited not to substitute our own inferences for those drawn by the Tax Court.

Accordingly, the decision of the Tax Court is affirmed.