**UNITED STATES of America, Plaintiff,**

v.

**Peter J. SCHMIDT, Jr., as Administrator of the Estate of Peter J. Schmidt, Sr.; Dorothy Schmidt; Peter J. Schmidt, Jr.; Anna Schmidt; and Pork House Super Market, Inc., a Missouri corporation; Defendants.**

No. 60C 303(1).

United States District Court
E. D. Missouri, E. D.
June 6, 1962.

807

D. Jeff Lance, U. S. Atty., and Grove Sweet, Asst. U. S. Atty., St. Louis, Mo., for plaintiff.

Morris A. Shenker and Frank Green, St. Louis, Mo., for defendants.

HARPER, Chief Judge.

This is a proceeding by the United States government under 26 U.S.C.A. §§ 7402–7403, and 28 U.S.C.A. §§ 1340, 1345 and 1396. The basic undisputed facts show that Peter Schmidt, Sr. (hereinafter referred to as "Senior"), died intestate on August 2, 1954, and that letters of administration were granted to

Peter Schmidt, **Jr.** (hereinafter referred to as "Junior"), on March 22, 1955. An inventory filed December 19, 1955, showed assets of the estate to be only $600.00. On August 24, 1955, plaintiff filed formal proof of claim with the Probate Court of the City of St. Louis for $17,947.45 of internal revenue taxes for the years 1946–47, upon which liability the period of limitation had been extended by a consent agreement with Senior. This was allowed as a first class claim on September 12, 1955, but only $376.37 had been paid upon closure of the estate and discharge of the administrator on December 15, 1958.

This controversy concerns the ownership of 258 shares of stock (Exhibits H and I) in Pork House Super Market, Inc. The government claims that Senior owned this stock at his death and that it is a part of his estate. Defendants, Junior and Dorothy Schmidt, claim that there was a valid transfer of 257 shares of the stock to them (Exhibit D), and defendant, Anna Schmidt, claims there was a valid transfer of one share of stock to her (Exhibit E), both for substantial consideration, on or about January 10, 1954, but the government urges that there was either a fraudulent conveyance (Count I) or no transfer at all (Count II).

If Senior owned the stock up to and shortly before his death, it seems clear, and has not been disputed, that the government has a lien pursuant to 26 U.S. C.A. § 6321, which reads:

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount * * shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

■ Senior's liability is admitted, and there is evidence of demand in addition to the filing of the claim in the Probate Court. That alone is apparently sufficient to satisfy the "demand" requirement of Section 6321. United States v. Ettelson, 7 Cir., 159 F.2d 193, l. c. 196.

The action before this court was brought to enforce the Section 6321 lien pursuant to 26 U.S.C.A. §§ 7402 and 7403(a), which read in relevant part as follows:

"In any case where there has been a refusal or neglect to pay any tax, or to discharge any liability in respect thereof, whether or not levy has been made, the Attorney General or his delegate, at the request of the Secretary or his delegate, may direct a civil action to be filed in a district court of the United States to enforce the lien of the United States under this title with respect to such tax or liability * * *."

■ Defendants, in spite of the apparent jurisdiction under this statute, argue vehemently that the court has no jurisdiction of this cause. The court finds no merit or relevance in the fact pointed out by defendants that the government has not proceeded under the fraudulent transferee section of the internal revenue code. The initial value of this point, if any, is negated since it is applicable only to Count I, and as later pointed out, the court will base its decision on Count II alone.

Defendants' main argument is that this is a proceeding for discovery of assets, and that it requires a trial of the legal title to the stock, which may be had only and exclusively in the Probate Court pursuant to Missouri statutes. Defendants cite 1949 M.R.S. Sections 462.-400–462.440, V.A.M.S., which sections are currently embodied in 1959 M.R.S. Sections 473.340–473.353, V.A.M.S., relating to a proceeding for the discovery of assets. These statutes do not on their face claim exclusive jurisdiction for the Probate Court, but defendants have cited eight cases for that proposition. That these cases are not compelling authority for a finding that this court lacks jurisdiction is evident upon examination. The proposition for which seven of these cases are cited is recognized in the eighth, Caldwell v. First National Bank of Wellston, Mo.App., 283 S.W.2d 921,

which cites the seven cases as a footnote for the following statement at l. c. 923:

"Ample authority supports the proposition that an action to discover assets cannot be initiated in the *circuit court* * * *." (Emphasis added.)

It is noted that *at most* these cases are authority that a "discovery of assets proceeding" should be in the Probate Court and not the circuit court. It would be a most strained interpretation to argue that these cases also oust the federal district court from jurisdiction in favor of the state probate court.

Further, an analysis of the case of State ex rel. Lipic et al. v. Flynn, 358 Mo. 429, 215 S.W.2d 446, upon which defendants rely heavily, indicates it is not controlling here. There an administratrix filed a discovery of assets proceeding in the Probate Court, and two days later filed a conversion action for the same property in the circuit court. "The only question in this proceeding," said the court at l. c. 448, "would be whether the probate court on the face of the affidavit had acquired exclusive jurisdiction of the controversy in the discovery of assets proceeding *before* the conversion suit was filed in the circuit court." (Emphasis added.) This language allows an inference that the administratrix could have taken her case to the circuit court before filing in the Probate Court and jurisdiction would have attached. The court here specifically concedes that "statutory proceedings for the discovery of assets are special and summary, and *are not preclusive as against other legal remedies* * * *." (Emphasis added, l. c. 448.)

Even if the Missouri statutes were specific in giving the Probate Court exclusive jurisdiction in an action like the present one, and even if cases were explicitly in accord, there is ample authority that the federal district court would not be bound by such statutes and decisions. United States v. Pettyjohn, D.C., 84 F. Supp. 423, was a case involving 26 U.S. C.A. § 3678, the predecessor of Section 7403. The court there said that even

though there was a claim in the Probate Court for part of the tax claim, this would not preclude the government from enforcing its lien in the district court (l. c. 426). It is further stated with reference to state authority infringing federal action:

"It would follow that these statutory provisions of the national government validly enacted by the Congress would prevail over all legislation and all decision of the state courts. No state could make a law, and no judge of the state could interpret the law, so as to interfere with the government in the collection of its revenue." l. c. 426.

The Federal district court of New York, in a suit against estates of deceased taxpayers and family corporation to recover unpaid income taxes assessed against taxpayers and their estates, United States v. E. Regensburg & Sons, 124 F.Supp. 687, tried the title to shares of corporate stock, resulting in setting aside of a foreclosure of a corporation's alleged liens on the stock, and an adjudication that the liens of the United States were valid liens against the stock. The action to enforce the government's liens was under 26 U.S.C.A. § 3678, the forerunner of the section involved in the action now before this court. While the court is not apprised of a New York statute specifically denominated as one for the "discovery of assets," New York undoubtedly has statutes under which the government could have accomplished what it set out to do and was allowed to do in the federal court instead. Real Property Law, Volume 49 McKinney's Consolidated Laws of New York, Ann., c. 50, § 268, is a suggested example. The Court in the Regensburg case again asserts that where sections of the internal revenue code conflict with state law, "under the Supremacy Clause, state law must yield." (l. c. 690.)

It is, therefore, the conclusion of this court that it has jurisdiction to entertain this cause, even though it may entail a trial of the legal title to the stock, and that it is empowered to give the relief prayed for, if warranted.

Turning then to the merits of the controversy, the court is faced with a determination of whether or not the 258 shares of stock were validly transferred to defendants, Junior, Dorothy Schmidt and Anna Schmidt. While some evidence was adduced at the trial relating to purported consideration for the transfer, and the legal efficacy of the "consideration" was argued on both sides, the court does not find it necessary to evaluate this evidence and determine the sufficiency of the "consideration." The case may be decided within the framework of the second count alone. This urges that Senior owned the stock prior to and at the date of his death and that a valid transfer was never effected.

The testimony shows that the 1953 and 1954 income tax returns of the corporation, which were prepared by a C.P.A., a member of a large auditing company, were offered in evidence (Exhibits 8 and 9.) The 1953 return was signed by Junior as president and Dorothy his wife, as secretary-treasurer, and the 1954 return, dated April 13, 1955, was signed by Dorothy as secretary-treasurer. Each of these returns show Senior as the owner of 99% of the stock of the corporation, Junior .5% and Dorothy .5%. The 1954 return shows Senior as deceased. The capital stock structure set out in the returns was obtained by the auditor from Dorothy, the secretary-treasurer. Each year, including the 1954 return, the auditor discussed the return with Dorothy before it was left for signature and filing. Before preparing the 1954 return the auditor asked Dorothy several questions pertaining to Senior's death.

Dorothy did not deny that the auditor asked her before she signed the 1954 return who owned the stock in the corporation, but stated she did not recall if he asked her for this information or not. She further testified she did not examine the returns before signing them, but on cross-examination admitted that at the deposition she testified she checked the returns before she signed them. She

further testified the stock certificate (Exhibit H) was endorsed by Senior in 1947 or 1948, but was not filled out until 1955.

There was expert testimony to the effect that the signatures purportedly made by Senior transferring the stock certificates (Exhibits H and I) were in fact forged. Mr. Webb, the handwriting expert, had highly satisfactory qualifications. He pointed out that several indicia of forgery were manifest in the purported signatures of Senior on the certificates—for example, tracing, hesitation, and lack of the smooth flow characteristic of genuine signatures.

The testimony of both Junior and his wife concerning the circumstances and chronology of events attending the signing and transfer of these particular certificates (Exhibits H and I) is so confused and inconsistent as not to be worthy of belief. It is certainly not sufficient to overcome the contrary testimony of a highly qualified expert, especially when taken in conjunction with the other testimony referred to herein.

It is, therefore, the court's conclusion that the signatures on the certificates (Exhibits H and I) purporting to transfer 258 shares of stock were forged, and the "transfer" was not thereby effected, so that the stock in question was owned by Senior at his death and became a part of his estate. It was "property" owned by "the delinquent," in the terms of Section 7403(a), subject to the government's lien.

Accordingly, it is the judgment of this court that the 258 shares of stock (Exhibits H and I) were never transferred by Peter J. Schmidt, Sr., and are the property of the estate of Peter J. Schmidt, Sr., and that this estate is indebted to plaintiff in the amount of $17,131.24, plus interest, in accordance with law. It is also adjudged that the government has a valid lien on these 258 shares, and an order will be entered pursuant to 26 U.S.C.A. § 7403, foreclosing the liens and decreeing a sale of such property, all the proceeds necessary for the satisfaction of the debt being applied thereto. In addition, there being some indication that monies or dividends may have been transferred to defendants after decedent's death as dividends or earnings accrued from the stock, the court will order a full and complete accounting by defendants of such money.

This memorandum opinion is adopted by the court as its findings of fact and conclusions of law, and the attorney for the plaintiff will prepare the proper judgment to be entered by the court in accordance with this opinion.